***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for some modifications. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission which has jurisdiction over the parties and the subject matter herein.
2. All parties are correctly designated, and there is no question as to misjoinder or non-joinder of parties, and all parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On the relevant dates herein, defendant-employer regularly employed more than three employees and an employer-employee relationship existed between the defendant-employer and plaintiff-employee.
4. On the relevant dates herein, Constitution State Service Company was the carrier on the risk.
5. The date of the injury giving rise to this claim was June 10, 1997.
6. Defendants admitted plaintiff's right to compensation by filing an Industrial Commission Form 60 on December 22, 1998.
7. Plaintiff was paid total disability benefits by defendants from December 15, 1998, through June 13, 1999. Defendants terminated temporary total disability compensation effective June 14, 1999 with a Form 28T when plaintiff commenced a trial return-to-work. Plaintiff's total disability benefits were reinstated effective July 31, 1999 with a Form 62 due to defendant-employer's inability to accommodate plaintiff's permanent lifting restrictions. Defendants have paid plaintiff ongoing total disability benefits continuously from July 31, 1999 through the present.
8. The parties submitted the following which were admitted into the evidence of record at the hearing before the Deputy Commissioner:
a. Stipulated Exhibit #1 Pretrial agreement
b. Stipulated Exhibit #2 Industrial Commission forms, motions and orders, plaintiff's medical records
c. Defendants' Exhibit #1 Plaintiff's attendance record
d. Defendants' Exhibit #2 Surveillance videotape
9. The issues to be determined by the Commission are:
a. whether plaintiff is entitled to medical and surgical treatment recommended by his authorized treating physician, Dr. Lloyd Hey;
b. whether plaintiff is entitled to total disability benefits in the amount of $512.00 per week;
c. whether defendants are estopped from denying that plaintiff is entitled to total disability benefits in the amount of $512.00 per week; and
d. what was plaintiff's average weekly wage at the time of his compensable injury on June 10, 1997.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-five years old, with his date of birth being November 5, 1957. On June 10, 1997, plaintiff was employed by defendants as a reach truck driver in the order processing department of defendants' facility in Concord. In that capacity, plaintiff's general duties included filling orders for customers.
2. On June 10, 1997, plaintiff injured his lower back while lifting a heavy box over his head. Plaintiff's injury was reported to his supervisor, Kevin Lamb, on or before June 17, 1997.
3. On June 23, 1997, defendants filed an Industrial Commission Form 19 showing that plaintiff earned $9.21 per hour and worked 12 hours per day, seven days per week. The Form 19 also indicated that plaintiff had an average weekly wage, including overtime, of $773.64.
4. Subsequent to his workplace injury of June 10, 1997, plaintiff was able to continue working for defendants through December 22, 1998. However, throughout this period, plaintiff's condition and symptoms gradually worsened until he was unable to continue working.
5. On August 27, 1997, an MRI ordered by Dr. Thomas Sikes was taken, revealing a left-sided L4 disc protrusion. Although surgery was an option at that time, plaintiff elected to forego surgery and to undergo nerve root blocks, a more conservative method of treatment.
6. Plaintiff's first nerve block injection was administered on September 25, 1997, but did not provide significant relief. Dr. Sikes then recommended that plaintiff accept the surgical treatment option.
7. Plaintiff continued working while receiving conservative treatment and experiencing ongoing pain.
8. On October 19, 1998, a second MRI ordered by Dr. Alfred Rhyne was taken. This MRI revealed that plaintiff also had significant spinal stenosis. Based upon these results and plaintiff's condition, Dr. Rhyne felt that plaintiff would probably be unable to return to his previous job with defendants, absent surgical intervention.
9. On December 15, 1998, plaintiff underwent a microdiscectomy performed by Dr. Rhyne. For this procedure and post-operative recovery, plaintiff was medically excused from work through June 14, 1999.
10. Corresponding with plaintiff's surgery, on December 15, 1998 defendants filed an Industrial Commission Form 60 admitting plaintiff's right to compensation and agreeing to pay total disability benefits of $512.00, the maximum weekly benefit for 1997. This compensation rate was based on an average weekly wage of $773.64.
11. On April 4, 1999, plaintiff was examined by Dr. Kenneth Ashkin at Mecklenburg Neurological for his right leg pain. Dr. Ashkin found that plaintiff had lumbar radiculopathy with involvement in the right leg relative to manipulation of the nerves during surgery or related to a postoperative wound infection, and referred him to a chronic pain center. Dr. Ashkin further indicated that it was unlikely that plaintiff would be able to return to his previous employment.
12. On June 10, 1999, Dr. Rhyne released plaintiff to return to work with a permanent lifting restriction of no more than thirty pounds and a permanent partial disability rating of twelve percent to the lumbar spine.
13. At the time he was released to return to work, plaintiff continued to experience significant back pain. Once he returned to work, plaintiff's symptoms continued to worsen and he was again removed from work on July 31, 1999. Plaintiff has not returned to any gainful employment since that time. With the removal of plaintiff from work, defendants filed an Industrial Commission Form 62 on August 4, 1999, noting that ongoing total disability benefits would be reinstated effective July 31, 1999.
14. On August 4, 1999, Dr. Rhyne ordered a myelogram and CT scan which revealed a disk protrusion at the L4-L5 level that was impinging on the right L5 nerve root, and annular bulging at L3-4 without focal disk herniation. Based upon these findings, Dr. Rhyne recommended a microdiscectomy rather than a fusion procedure.
15. Plaintiff then sought a second opinion from Dr. Hemanth Rao, a neurologist, who agreed with Dr. Rhyne's assessment.
16. On September 2, 1999, plaintiff underwent a second discectomy. Plaintiff continued to experience right sided pain subsequent to this procedure, so a trigger point injection was administered on October 28, 1999, and plaintiff was advised to continue physical therapy and back strengthening exercises.
17. On February 24, 2000, plaintiff was examined by Dr. Lloyd Hey at Duke University Medical Center for ongoing radiating pain in his legs and back. Plaintiff had begun to experience tingling and numbness in both legs which radiated into his feet. Following an examination, Dr. Hey recommended L4-5 facet injections and ordered an EMG nerve conduction study in both lower extremities. Dr. Hey indicated at that time that should the facet injections fail, he would recommend surgery.
18. Following the injections, plaintiff returned to Dr. Hey and reported experiencing agonizing low back pain that prevented him from performing most daily activities.
19. On August 24, 2001, L4-L5 decompression and fusion surgery with bone graft was performed. At his deposition, Dr. Hey testified that plaintiff obtained some relief from the surgery, but he continued to experience back and intermittent right leg pain.
20. By February 18, 2002, plaintiff reported to Dr. Hey that he was experiencing increased numbness and tingling, more on the right side than the left, and also increased leg pain. Additionally, at that time it was noted that the TENS unit prescribed by Dr. Billy Huh at Duke Medical Center Pain Management was not helping.
21. Plaintiff returned to Dr. Hey on January 9, 2003, and reported experiencing a significant increase in back pain and radiating right leg pain. Dr. Hey reviewed x-rays that showed loosening around the L5 screws inserted previously that suggested pseudoarthrosis, meaning that the bones had not healed at the L4-L5 level.
22. Based upon these findings, Dr. Hey recommended a CT myelogram to examine plaintiff's spinal nerve root anatomy and discograms to determine whether he had any symptomatic levels above or below. However, without explanation, defendants refused to authorize Dr. Hey's recommendations. Because of the severity of his pain, plaintiff obtained the discogram and CT myelogram on his own. Upon reviewing the results of the studies, Dr. Hey recommended an anterior fusion at the L4-L5 level.
23. Dr. Hey concluded that plaintiff's symptoms as of January 9, 2003 were causally related to his admittedly compensable injury and the resulting discectomy surgical procedures. Additionally, Dr. Hey testified that the recommended fusion surgery would provide relief to plaintiff from his debilitating symptoms.
24. Dr. Huh agreed with Dr. Hey's assessment of plaintiff's condition and in January 2003 prescribed strong pain medication and anti-depressants for plaintiff's pain related depression. Dr. Huh testified that it was not uncommon for patients to develop depression from persistent pain, the resulting change in lifestyle, and loss of financial stability.
25. Additionally, Dr. Huh believed that plaintiff's pain and depression were causally related to his original back injury on June 10, 1997.
26. At the hearing before the Deputy Commissioner, Mike Sheehan testified regarding his surveillance of plaintiff on February 25 and 28, 2003. Defendants contend that plaintiff's activities shown in the surveillance videotape are indicative of a person with no physical limitations. However, because Mr. Sheehan taped a mere nine minutes during twelve hours of surveillance, the videotape and his testimony regarding its contents are given little weight by the Full Commission.
27. As the direct and natural result of, and causally related to his June 10, 1997 injury by accident and related surgical procedures, by January 2003 plaintiff's back pain and radiating leg pain worsened to the extent that the fusion surgery recommended by Dr. Hey was reasonably necessary to effect a cure and provide relief.
28. As the direct and natural result of, and causally related to his compensable June 10, 1997 injury by accident and related surgical procedures, plaintiff developed depression. for which he is receiving reasonably necessary treatment by Dr. Huh.
29. Both Dr. Hey and Dr. Huh testified that plaintiff is unable to work and that it is unlikely that he will be able to return to gainful employment without their recommended treatment.
30. As the result of his June 10, 1997 injury by accident, related surgeries, ongoing symptoms and his depression, plaintiff has been unable to earn any wages in his former position with defendants or in any other employment from July 31, 1999 through the present and continuing.
31. Defendants paid total disability compensation to plaintiff at the rate of $512.00 per week for the periods of December 15, 1998 through June 13, 1999, and from July 31, 1999 to January 29, 2003.
32. On January 29, 2003, defendants notified plaintiff by correspondence that it was their contention that an overpayment had been made due to a miscalculation of his average weekly wage.
33. As of February 1, 2003, defendants unilaterally reduced the amount of weekly benefits paid to plaintiff to $206.40, a reduction of $305.60. Plaintiff did not consent to that reduction and contends that defendants should be estopped from reducing the rate of his weekly benefits based upon equitable principles and the doctrine of laches. Defendants contend that based upon plaintiff's correct wage information, an Industrial Commission Form 22 Wage Chart was completed, showing that plaintiff earned $16,098.02 in the fifty-two weeks preceding his date of injury, which yields an average weekly wage of $309.58, and a compensation rate of $206.40.
34. On December 19, 2002 defendants filed a Form 22. The instructions on the Form 22 require an employer to:
 "[P]lace an X in the proper squares to indicate days paid in full. Days the employee is on paid vacation leave and/or paid sick leave should be marked with an X. Leave blank squares to indicate days not paid in full for any reason. Total earnings for each pay period should be placed in the proper column. If the employee's job or pay rate was changed during the reported period, this should be noted, with an indication as to the nature of the change."
Rather than complying with the specific instructions, defendants prepared the Form 22 which has no information on the days plaintiff worked and merely shows the total amounts earned each month. The amounts listed for five of the twelve months listed are different and no information is listed to explain variations in pay.
35. Plaintiff's 1996, 1997 and 1998 tax returns are a part of the evidence of record, as are plaintiff's daily attendance records for 1997. Plaintiff's daily attendance records for 1997 show different numbers of absences per month ranging from one to six days. However, plaintiff's pay per month in 1997 remained the same each month according to the Form 22.
36. Because defendants failed to submit a properly completed Form 22, the Form 22 does not constitute competent evidence of plaintiff's average weekly wage and the Form 22 is not sufficient evidence from which to compute an average weekly wage. Defendants have not presented competent evidence that the average weekly wage paid plaintiff for over five years was incorrect. Therefore, the Full Commission finds as fact that plaintiff's average weekly wage is $773.64, which yields the maximum compensation rate for 1997 of $512.00.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On June 10, 1997, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). Plaintiff's back pain and radiating leg pain as of January 2003 and his depression are the direct and natural result of and causally related to his June 10, 1997 injury by accident and related surgical procedures. Id.
2. As the result of his June 10, 1997 injury by accident, related surgeries, ongoing symptoms and his depression, plaintiff is entitled to have defendants pay ongoing total disability benefits at the rate of $512.00 per week from July 31, 1999 through the present and continuing until such time as he returns to work or further Order from the Commission. N.C. Gen. Stat. § 97-29. For the period from February 1, 2003 through the date of this Opinion and Award, defendants have underpaid plaintiff $305.60 per week. N.C. Gen. Stat. § 97-29.
3. As the result his June 10, 1997 injury by accident, related surgeries, ongoing symptoms and his depression, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred, including the CT myelogram, discogram and lumbar fusion surgery recommended by Dr. Hey and treatments for depression provided by or recommended by Dr. Huh. N.C. Gen. Stat. §§ 97-25; 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing total disability benefits at the rate of $512.00 per week from July 31, 1999 through the present and continuing until such time as he returns to work or further Order from the Commission. For the period from February 1, 2003 through the date of this Opinion and Award, defendants have underpaid plaintiff $305.60 per week. This underpayment has accrued and shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved below.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as the result of his June 10, 1997 injury by accident, related surgeries, and ongoing depression, including the CT myelogram, discogram and lumbar fusion surgery as recommended by Dr. Hey and treatments for depression as recommended by Dr. Huh.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded above is approved for counsel for plaintiff. From the accrued compensation, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. Defendants shall pay the costs.
This the 22nd day of November 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/mlb